1
2
3
4              UNITED STATES DISTRICT COURT

5                   DISTRICT OF NEVADA

6    LAWRENCE EVERETT WILGUS,              3:13-cv-00368-MMD-WGC

7                         Plaintiff,       **REPORT & RECOMMENDATION OF**
                                           **U.S. MAGISTRATE JUDGE**
8          v.

9    BRUCE BANNISTER, et. al.,

10                       Defendants.

11

12         This Report and Recommendation is made to the Honorable Miranda M. Du, United

13   States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to

14   28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR IB 1-4. Before the court is

15   Plaintiff's Motion for Partial Summary Judgment. (Doc. # 27.)[1] Defendants filed a response

16   (Doc. # 29) and Cross-Motion for Summary Judgment (Doc. # 30).[2] Plaintiff filed a combined

17   reply in support of his motion and opposition to Defendants' cross-motion (Doc. # 37) and errata

18   (with an amended Exhibit 1A) (Docs. # 38, # 38-1). Defendants filed a reply in support of their

19   cross-motion. (Doc. # 39.)

20         After a thorough review, the court recommends that Plaintiff's motion be denied and that

21   Defendants' motion be granted.

22                            **I. BACKGROUND**

23   **A. General Information**

24         At all relevant times, Plaintiff was an inmate in custody of the Nevada Department of

25
        _____

26         [1] Refers to court's docket number. Plaintiff initially filed his Motion for Summary Judgment on July 22,
     2014 (Doc. # 23); however, the court subsequently issued an order notifying Plaintiff that certain of the exhibits to
27   the motion contained personal information, including Plaintiff's social security number and date of birth, which
     should have been redacted pursuant to Special Order 109. (Doc. # 26.) Plaintiff re-filed the motion as Doc. # 27.
     Therefore, all references to Plaintiff's motion will be to Doc. # 27 and not Doc. # 23.
28
           [2] Docs. # 29 and  # 30 are identical.

Corrections (NDOC). (Pl.'s Am. Compl., Doc. # 6 at 1.) Plaintiff has since been released from custody on parole. (*Id.* at 27 ¶ 100.) Plaintiff, who is now represented by counsel, brings this action pursuant to 42 U.S.C. § 1983. (*Id.*) The allegations giving rise to this action took place while Plaintiff was housed at Humboldt Conservation Camp (HCC), Lovelock Correctional Center (LCC) and Northern Nevada Correctional Center (NNCC). (*Id.*)

Defendants are: NDOC's Medical Director Bruce Bannister; Attorney General Catherine Cortez Masto; LCC's Director of Nursing Don Poag; Dr. Johns (NNCC); Dr. Scott (LCC); NDOC Deputy Director E.K. McDaniel; LCC Caseworker Garcia; NNCC Caseworker J. Buchanan; NNCC Warden Jack Palmer; NDOC Director James "Greg" Cox; HCC Culinary Officer John Doe A; NNCC Director of Nursing John Peery; Dr. Gedney (NNCC); LCC Caseworker Bellanger; LCC Caseworker Waters; LCC Caseworker R. Herrera; LCC Offender Management Administrator Rex Reed; NNCC Warden Robert LeGrand; and NDOC Public Information Officer Steve Suwe. (*Id.* at 3-13.)

**B. Allegations and Claims**

Plaintiff's allegations can be divided generally into two subject areas: (1) the entry of a false escape charge that resulted in his wrongful transfer from minimum security facility HCC to medium security facility, LCC, excessive force attendant to his transfer, and the failure to provide him with a timely classification review; and (2) delayed and inadequate medical care at LCC and NNCC from the time he was transferred on July 18, 2011 until he was released on parole on February 2, 2012.

**1. False Escape Entry, Excessive Force, Transfer to LCC, and Classification**

**a. Allegations**

Plaintiff contends that he was convicted of receiving stolen property and sentenced to a term of imprisonment of not less than one year and not more than four years. (Doc. # 6 at 4.)[3] He was taken to NNCC on June 8, 2011. (*Id.* at 14 ¶ 22.) He was then placed at HCC, a minimum custody facility, where he remained from July 12, 2011 until July 18, 2011. (*Id.* at 14 ¶¶ 23-24.)

---

[3] According to Plaintiff's prison records, he was previously incarcerated from 2001 to 2004, when he was released on parole, and then was incarcerated again for a period of time in 2006, and was released on parole before he was re-committed in 2011. (Doc. # 30-1 at 2.)

On July 18, 2011, he claims that Tina Atkinson (referred to in other filings as his fiancé) contacted defendant Steve Suwe[4] by phone to ask him about program information and parole procedures for Plaintiff. (*Id*. at 15 ¶ 26.) He avers that Suwe informed Ms. Atkinson that Plaintiff was an escapee and stated: "Oh yeah, I remember this guy. He shouldn't be in camp; I'll fix that right now!." (*Id*.)

Plaintiff contends that Suwe proceeded to make a notation in NDOC's computer system, the Nevada Offender Tracking Information System (NOTIS), indicating a prior escape; Plaintiff claims the notation was false. (*Id*. ¶ 28.) Instead, he explains that he "violated" in June 2003 while he was housed at Northern Nevada Restitution Center (NNRC) for being out of his designated area and for having a "dirty UA", but he was never charged with an escape or attempted escape. (*Id*. ¶¶ 30-31.) Plaintiff claims that Suwe's act of entering this notation resulted in his being forcefully detained by defendant John Doe A, causing an injury to his left shoulder. (*Id*.) He claims that Suwe's action also resulted in his transfer from HCC, a minimum custody facility, to LCC, a medium custody facility. (*Id*. ¶ 28.)

He avers that Ms. Atkinson, who was concerned for Plaintiff's safety, called Suwe's supervisor, defendant Rex Reed, and advised Reed of her conversation with Suwe, yet he did nothing to intervene. (*Id*. ¶ 27.)

Shortly after his arrival at LCC (July 18, 2011), he says he began sending requests and grievances to be seen by the classification committee, which he claims should have occurred within three working days of his arrival to LCC. (*Id*. ¶¶ 30, 32, 37, 38, 53.) He was not given a classification review until November 9, 2011, when he was denied minimum custody status. (*Id*. ¶ 85.) He grieved the classification committee's determination, to no avail. (*Id*. ¶¶ 87, 91.) He was released on parole on February 2, 2012. (*Id*. ¶ 100.)

### b. Claims

In connection with these allegations, he asserts the following claims:

///

---

[4] Suwe was a Classification and Planning Specialist within NDOC's Offender Management Division (OMD). (Doc. # 30-3 ¶ 3.)

- 3 -

### 1. Count I

In Count I, Plaintiff asserts a claim for violation of the Fourth Amendment for false arrest and fabrication of evidence against Suwe. (Doc. # 6 at 30 ¶ 114.) This claim is based on the allegation that Suwe placed the false escape note in NOTIS at HCC which resulted in the issuance of a lockdown, and Plaintiff being detained and transferred to LCC. (*Id*.)[5]

### 2. Count II

In Count II, he asserts a Fourth Amendment claim which he titles "failure to keep from harm" against Suwe. (Doc. # 6 at 32 ¶ 120.) Here, he alleges that NDOC's policy did not limit the ability to change criminal history and sentence information in NOTIS to only those users requiring such access to perform their job duties, and security measures limiting this access would have prevented Plaintiff from being forcefully detained. (*Id.*)

### 3. Count III

In Count III, Plaintiff alleges that when he reported to his caseworker's office after Suwe had entered the false escape notation in his file, officer John Doe A forcibly detained Plaintiff and jerked his arms to his backside to handcuff him, and he felt a blunt blow to the back of his left shoulder which caused his left rotator cuff and scapula to tear. (Doc. # 6 at 32-33 ¶¶ 121-123.)

### 4. Count V

In Count V, Plaintiff alleges that his due process rights under the Fifth and Fourteenth Amendments were violated by defendants Suwe, Reed, Cox, Palmer, Bellanger, Buchanan, Cortez Masto, LeGrand, McDaniel, Herrera, Garcia, Waters and Palmer. (Doc. # 6 at 35-36 ¶¶ 135-141.)

This claim is based on the allegation that Suwe's false report caused Plaintiff to be moved from a minimum custody to a medium custody facility resulting in the loss of good time and work credits which would have allowed him to expire his prison sentence sooner. (*Id*. ¶ 135.) He contends that Reed and Cox were aware of these actions, but failed to intervene. (*Id*. ¶¶ 135-

---

[5] Count I also references various criminal provisions from the Nevada Revised Statutes which are not properly asserted in a federal civil rights case such as this one.

136.) This claim is further based on the allegation that he was not given twenty-four hours advance notice of the classification change as required by AR 503.04.2.a, and Palmer, Bellanger, and Buchanan failed to give him a classification hearing within three working days of his arrival at LCC. (*Id.* ¶¶ 137-138.) He avers that Cox, Reed, Cortez Masto, LeGrand and McDaniel had knowledge of the failure to follow classification protocols, but failed to intervene. (*Id.* ¶ 139.)

### 5. Count VI

Count VI purports to state an Eighth Amendment claim against Suwe and Reed based on Ms. Atkinson's phone calls to each of them, and Plaintiff's subsequent transfer from HCC to LCC. (Doc. # 6 at 37-38 ¶¶ 142-147.)

Under the Eighth Amendment, prison conditions should not "involve the wanton and unnecessary infliction of pain" or be "grossly disproportionate to the severity of the crime warranting imprisonment." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). Although prison conditions may be, and often are, restrictive and harsh, prison officials "must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)(quoting *Hudson v. Palmer*, 486 U.S. 517, 526-27 (1984)).

The court finds that Plaintiff does not state a colorable Eighth Amendment claim under these facts, and summary judgment should be granted in Defendants' favor as to Count VI because these allegations are more appropriately analyzed under the due process legal theory already asserted by Plaintiff.

### 2. Medical Care

#### a. Allegations

Plaintiff also claims that while he was at LCC and NNCC, various defendants were deliberately indifferent to his serious medical needs, which included ongoing shoulder pain eventually diagnosed as a torn rotator cuff and winged scapula, gastrointestinal issues and dental pain stemming from a broken tooth.

#### b. Claims

Plaintiff asserts the following claims based on these allegations:

### 1. Count IV

In Count IV, Plaintiff alleges that he reported extreme pain and requested medical attention from defendants Poag, Dr. Scott, Dr. Gedney, Dr. Johns, and Dr. Bannister, but they refused to properly diagnose, treat or refer Plaintiff to a specialist in a timely manner, even after he had no improvement in the condition of his shoulder after six weeks. (Doc. # 6 at 33 ¶ 125.) He contends that the tear in his rotator cuff should have been timely fixed to avoid further complications. (*Id*. ¶ 126.)

He further alleges that defendant Poag was deliberately indifferent when he refused Plaintiff a second opinion regarding his shoulder, stating that Plaintiff had been medically treated because he had seen a doctor (but Plaintiff received no treatment), and threatened to send Plaintiff to the hold if he continued to ask for pain medication. (*Id*. at 22-24 ¶ 127.)

He contends that Dr. Scott was deliberately indifferent when he made Plaintiff wait nine weeks to be transferred to NNCC for an MRI of his shoulder and eight weeks for an ultrasound of his testicle. (*Id*. ¶ 128.)

He claims Poag, Dr. Scott and Dr. Gedney were further deliberately indifferent because they were responsible for Plaintiff suffering in agonizing pain for months. (*Id*. ¶¶ 129, 131-132.) He contends that Plaintiff was incarcerated for six and a half months without receiving any meaningful treatment for his left shoulder other than x-rays. (*Id*. ¶ 130.)

Finally, he asserts that Dr. Bannister, Attorney General Cortez Masto, Poag, McDaniel, Garcia, Buchanan, Palmer, Cox, Bellanger, Waters, Herrera, Reed and LeGrand had knowledge of the inadequate medical treatment through grievances, yet failed to intervene to protect Plaintiff. (*Id*. ¶¶ 133-134.)

### 2. Count VII

In Count VII, Plaintiff alleges that he sent numerous kites and grievances about his left shoulder pain at both LCC and NNCC, putting Dr. Bannister, Dr. Johns, Dr. Scott, McDaniel, Palmer, Cox, Attorney General Cortez Masto, Poag, Peery, and Dr. Gedney on notice of the lack of care he was receiving from their subordinates, yet they failed to intervene. (Doc. # 6 at 38 ¶¶ 148-149.)

He further avers that as a result of the failure to provide him with treatment, he continued to suffer pain in his left shoulder, as well as back pain due to overcompensation. (*Id*. ¶ 150.)

He contends that he continually saw doctors related to his heart burn, but Drs. Johns, Scott and Gedney did not seek to discover the root cause of this ailment, or listen to Plaintiff when he told them he had recently been prescribed a proton pump inhibitor for his GERD, and without it, he would aspirate the contents of his stomach and vomit. (*Id.* ¶ 151.) Instead, they merely gave him antacid tablets and Zantac; as a result, he suffers from an inflamed esophagus and vomits nightly. (*Id*. at 39 ¶ 152.)

Finally, he asserts that Dr. Scott, Dr. Johns, Dr. Gedney, Poag, Peery, and Dr. Bannister were unconcerned about the pain Plaintiff was in because of their failure to investigate his medical history. (*Id*. ¶ 153.)

### 3. Count VIII

In Count VIII, Plaintiff alleges again that defendants Dr. Bannister, Dr. Johns, Dr. Scott, Attorney General Cortez Masto, Poag, Peery, and Dr. Gedney failed to properly diagnose, treat or refer out Plaintiff's serious injury in a timely manner, leaving him to suffer in pain for six and a half months with a torn rotator cuff, torn scapula, nerve damage and bone spurs in his clavicle bone. (Doc # 6 at 39-40 ¶¶ 154, 156.) He contends that his winged scapula is irreparable. (*Id*.) He asserts that with time, the size in the rotator cuff tear increases, and the muscle may turn into fat, such that even when repaired it will not likely improve his functions. (*Id*. ¶ 156.) He claims that Dr. Scott, Dr. Johns and Dr. Gedney ignored the fact that he still could not lift his left arm after six weeks, and failed to order an MRI of Plaintiff's shoulder, and instead he waited four and a half months to get an MRI which revealed the torn rotator cuff, scapula and bone spurs of the clavicle that required surgery. (*Id*. ¶ 157.) He contends that they also ignored that his shoulder blade winged-out. (*Id*.)

He further avers that Cox, Dr. Bannister, Palmer, LeGrand, Reed, Attorney General Cortez Masto, and McDaniel had knowledge their subordinates were refusing to treat Plaintiff or refer him to a specialist in a timely fashion, yet failed to intervene. (*Id*. at 40 ¶ 155.) He likewise claims that Dr. Scott, Dr. Johns, Dr. Gedney, Poag, Peery, Palmer, McDaniel, LeGrand, Reed

1   and Suwe were deliberately indifferent to his requests and grievances seeking medical attention,

2   by failing to intervene. (*Id*. at 41 ¶ 158.)

### 4. Count IX

4   Finally, in Count IX, Plaintiff includes a claim of deliberate indifference based on his

5   allegation that NDOC's health care system lacks: ready access to medical care; adequate medical

6   record keeping; reasonably speedy referrals and access to other physicians within or outside the

7   prison; an adequate system for responding to emergencies. (Doc. # 6 at 41 ¶¶ 159-160.) He

8   further alleges that internal audits discovered that NDOC medical staff only worked five to five

9   and a half hours of their ten hour shifts, and if they had worked their entire shift, his medical care

10  would not have been so delayed. (*Id*. at 41-42 ¶¶ 161-162.)

11  **C. Plaintiff's Motion**

12  Plaintiff provides a discussion of his version of events as they occurred during his

13  incarceration at HCC, LCC and NNCC from July 11, 2011 until February 2, 2012. He then

14  presents his argument, which can be divided into three categories: (1) the alleged deprivation of

15  his assigned minimum custody status when he was transferred from HCC to LCC on July 18,

16  2011, which he contends violated his due process rights; (2) the alleged use of excessive force

17  against him by an unknown correctional officer at HCC on July 18, 2011; and (2) the alleged

18  deliberate indifference to his serious medical needs at LCC and NNCC from July 18, 2011

19  through February 2, 2011, when he was released, and retaliation for requesting medical care.

20  Finally, he asserts he is entitled to summary judgment on the issue of whether the Defendants are

21  entitled to qualified immunity. (Doc. # 27.)

22  **D. Defendants' Opposition and Cross-Motion**

23  In their response to Plaintiff's Motion for Summary Judgment, Defendants argue:

24  (1) Plaintiff's Fourteenth Amendment rights were not violated because he has no liberty interest

25  in his classification status; (2) Plaintiff did not plead a First Amendment retaliation claim, and

26  cannot create one by asserting the facts in his dispositive motion; (3) Plaintiff failed to identify a

27  defendant responsible for the alleged excessive force, and even if he did, there is no evidence of

28  excessive force; (4) Defendants were not deliberately indifferent to Plaintiff's medical needs;

1    (5) Plaintiff references a broken tooth in his Amended Complaint, but makes no direct Eighth

2    Amendment claim against NDOC medical or dental personnel, and cannot amend his complaint

3    through his dispositive motion; and (6) Defendants are entitled to qualified immunity. (Docs. #

4    29/30 at 23-30.)

5        In their Cross-Motion for Summary Judgment Defendants include additional arguments,

6    which can be summarized as follows: (1) Suwe did not fabricate evidence or enter a false arrest

7    charge into Plaintiff's NOTIS record, but entered a warning casenote into NOTIS indicating that

8    due to the incident that occurred at Northern Nevada Restitution Center (NNCC) (where Plaintiff

9    was incarcerated in 2003), Plaintiff was not eligible for minimum custody; (2) Plaintiff failed to

10    identify a defendant responsible for the alleged use of force against him; (3) NDOC consistently

11    acted to accommodate Plaintiff's complaints of pain, was seen at sick call as well as by doctors

12    and specialists, was given pain medication, an x-ray and an MRI before he was released on

13    parole; (4) the Fifth Amendment is not applicable to these state employee defendants, as alleged

14    in Count V; (5) Plaintiff has no protected liberty interest in his custody status; therefore, there

15    was no violation of his Fourteenth Amendment due process rights; (6) NDOC was not

16    deliberately indifferent with respect to Plaintiff's heartburn complaints; (7) Plaintiff's claim in

17    Count IX that NDOC's healthcare system is inadequate is unsupported by the facts; (8) Plaintiff

18    cannot demonstrate that defendants Bannister, Bellanger, Buchanan, Cox, Masto, Herrera,

19    LeGrand, McDaniel, Palmer, Peery, and Waters had any personal involvement in the alleged

20    constitutional violations, and therefore, they cannot be held liable as supervisors; (9) Defendants

21    cannot be sued in their official capacities; and (10) Defendants are entitled to qualified

22    immunity. (Docs. # 29/30 at 8-23.)

23                   **II. LEGAL STANDARD**

24        "The purpose of summary judgment is to avoid unnecessary trials when there is no

25    dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18

26    F.3d 1468, 1471 (9th Cir. 1994) (citation omitted). In considering a motion for summary

27    judgment, all reasonable inferences are drawn in favor of the non-moving party. *In re Slatkin*,

28    525 F.3d 805, 810 (9th Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255

(1986)). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On the other hand, where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1)(A), (B).

If a party relies on an affidavit or declaration to support or oppose a motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

In evaluating whether or not summary judgment is appropriate, three steps are necessary: (1) determining whether a fact is material; (2) determining whether there is a genuine dispute as to a material fact; and (3) considering the evidence in light of the appropriate standard of proof. *See Anderson*, 477 U.S. at 248-250. As to materiality, only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment; factual disputes which are irrelevant or unnecessary will not be considered. *Id.* at 248.

In deciding a motion for summary judgment, the court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, 'it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.'...In such a case, the moving party has the initial burden of establishing the absence of a genuine [dispute] of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate

an essential element of the nonmoving party's case; or (2) by demonstrating the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp. v. Cartrett*, 477 U.S. 317, 323-25 (1986).

If the moving party satisfies its initial burden, the burden shifts to the opposing party to establish that a genuine dispute exists as to a material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a genuine dispute of material fact, the opposing party need not establish a genuine dispute of material fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (quotation marks and citation omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted). The nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *Id*. Instead, the opposition must go  beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine dispute of material fact for trial. *Celotex*, 477 U.S. at 324.

> That being said,
> [i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it; or (4) issue any other appropriate order.

Fed. R. Civ. P. 56(e).

At summary judgment, the court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine dispute of material fact for trial. *See Anderson*, 477 U.S. at 249. While the evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in its favor," if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *Id*. at 249-

50 (citations omitted).

## III. DISCUSSION

### A. Count III-Excessive Force

As stated above, in Count III, Plaintiff alleges that after Suwe allegedly entered the information into NOTIS regarding the 2003 incident, officer John Doe A jerked Plaintiff's arms to his backside to handcuff him and he felt a blunt blow to the back of his left shoulder which caused his left rotator cuff and scapula to tear. (Doc. # 6 at 32-33 ¶¶ 121-123.) Plaintiff argues he is entitled to summary judgment on this claim, while Defendants oppose the motion and contend summary judgment should be granted in their favor.

Plaintiff argues that no force should have been used against him because he did not resist. (Doc. # 27 at 20:15-16. 21:23-26, 22:3-8.) In addition, he asserts that force should not have been utilized in the first place because the information regarding his being an escape risk was false. (*Id*. at 20:16-17.) He contends that the use of force left him with intense pain in his left shoulder, causing a torn rotator cuff and making his scapular wing out permanently. (*Id*. at 22:3-8.)

Defendants contend they are entitled to summary judgment because Plaintiff did not identify any defendant responsible for the alleged use of force, despite having an opportunity to conduct discovery regarding John Doe A's identity. (Doc. # 29 at 10.)

In his reply, curiously, Plaintiff argues that his failure to name the unknown Doe defendant is irrelevant to the issues before the court. (Doc. # 37 at 9:17-22.) Then, he asserts, on the one hand, that he was pro se through discovery and no discovery was exchanged. (*Id.*) On the other hand, he presents the declaration of Ms. Atkinson which states that she met with a prior Deputy Attorney General assigned to this case and sent him a request for production of documents on Plaintiff's behalf, and it was represented that responses would be forthcoming but apparently were not. (Doc. # 37-3 at 1 (Atkinson Decl. (2)); Pl.'s request for production of documents, Doc. # 37-3 at 5-6.)

It is axiomatic that the court cannot enter summary judgment against an unidentified and un-served Doe defendant. Under the Federal Rules of Civil Procedure, a defendant must be identified and served with the summons and complaint with proof of service made to the court

before an action may proceed against the defendant.  (Fed. R. Civ. P. 3, 4.) If a plaintiff fails to serve a defendant with the summons and complaint within 120 days of the filing of the complaint, then absent a showing of good cause the complaint must be dismissed without prejudice. Fed. R. Civ. P. 4(m).

It is true that Plaintiff litigated this action in pro per until counsel entered an appearance on June 23, 2014. (*See* Doc. # 20, Notice of Appearance by attorney Treva J. Hearne.) While courts must liberally construe the *pleadings* of pro se litigants, *see, e.g., Hamilton v. Brown*, 630 F.3d 889, 893 (9th Cir. 2011), "[p]ro se litigants must follow the same rules of procedure that govern other litigants." *King v. Atiyeh*, 814 F.2d 565, 567 (9th Cir. 1987), *overruled on other grounds by Lacey v. Maricopa Cnty.*, 693 F.3d 896 (9th Cir. 2012) (en banc).

"'[S]trict time limits ... ought not to be insisted upon' where restraints resulting from a pro se prisoner plaintiff's incarceration prevent timely compliance with court deadlines." *Eldridge v. Block*, 832 F.2d 1132, 1136 (9th Cir. 1987) (quoting *Tarantino v. Eggers*, 380 F.2d 465, 468 (9th Cir. 1967)). Plaintiff does not argue, however, that constraints resulting from his incarceration (*i.e.*, the speed of the prison mail system) resulted in his inability to identify and substitute in a name for John Doe A, and then serve the defendant. He acknowledges that he had 180 days to conduct discovery, and asserts  both that no discovery was undertaken by either side and that he sent a request for production of documents to Defendants but never received a response. Plaintiff does not indicate that he took any efforts to follow up with the Deputy Attorney General regarding the responses to discovery. Nor did he file a motion to compel or motion to have additional time to identify, substitute and serve John Doe A. Plaintiff cannot feign that he did not know he had to conduct discovery to ascertain John Doe A's identity because the first line of his Amended Complaint, filed pro se, prays for leave to amend "to include John/Jane Does once they become known through the discovery throughout this case." (Doc. # 6 at 1 ¶ 1.)

Even when counsel entered an appearance, no request was made to extend the deadline to identify and serve John Doe A by making a good cause showing under Rule 4(m). Nor was a request made to modify the scheduling order, or re-open discovery. Instead, counsel proceeded with filing Plaintiff's dispositive motion without addressing the identification of John Doe A.

It has been well over a year since the Amended Complaint was filed; just shy of a year since the deadline for amending the pleadings or adding new parties passed; some eight months since the discovery cutoff and the date counsel entered her appearance; and almost nine months since the deadline for extending or modifying the scheduling order passed. Importantly, it has been nearly six months since Defendants' filed their response to Plaintiff's motion alerting him and his counsel, if for some reason they did not already realize it, that no defendant had been identified, substituted in and served with respect to the excessive force claim in Count III. Yet, Plaintiff still has taken no action to remedy this defect. There has been no request to modify the scheduling order and to re-open discovery to identify this individual, or to extend the deadline to serve him.

Instead, Plaintiff persists in his reliance on the misplaced argument that he can obtain summary judgment against an unidentified, unnamed, and un-served individual. This position is simply untenable, and defies not only logic, but more importantly, the fundamental principles of due process.

Defendants' opposition put Plaintiff on notice of this defect, giving Plaintiff an opportunity to make a good cause showing as to why John Doe A has not been identified, substituted in and served. The court finds that the reasons proffered by Plaintiff—that he was pro se, and that discovery either was not undertaken or it was undertaken but no responses were given—do not amount to good cause. With no good cause established for Plaintiff's failure to identify and substitute in this individual in the more than fifteen months since the Amended Complaint was filed, the court must recommend that Count III be dismissed without prejudice as to defendant John Doe A pursuant to Federal Rule of Civil Procedure 4(m).

**B. NOTIS Entry/Transfer from HCC to LCC/Classification**

The allegations related to the NOTIS entry made by Suwe, Plaintiff's transfer from HCC to LCC, and his classification will be analyzed together. These allegations pertain to Counts I, II, and V. Insofar as Plaintiff claims a violation of his due process rights under the Fifth Amendment in Count V based on these allegations, the court will construe Plaintiff's claim as one for violation of his due process rights under the Fourteenth Amendment. The Fifth

1 Amendment's Due Process Clause applies only to action by the federal government. *See, e.g.,*

2 *Bingue v. Prunchak*, 512 F.3d 1169, 1174 (9ᵗʰ Cir. 2008) (citation omitted).

3     **1. Facts**

4         The parties do not dispute that on June 8, 2011, Plaintiff was sent to NNCC for intake

5 and processing after being convicted of buying, possessing, receiving and withholding stolen

6 property. (Docs. # 29/30 at 2; Doc. # 6 at 4 ¶ 1; Doc. # 27 at 7:11-12; Doc. # 27-3; Doc. # 27-5

7 ¶ 5.) Upon arrival to NNCC, an intake health screening form was completed noting Plaintiff's

8 health history. (Docs. # 29/30 at 2; Doc. # 31-1 at 2-5; Doc. # 6 at 14 ¶ 22; Doc. # 27-11.)

9 According to the form, Plaintiff was in no obvious pain. (Doc. # 31-1 at 2; Doc. # 27-11 at 3.)

10 The box was checked indicating he had some restriction in his mobility, and had a torn ACL on

11 his right knee and a left shoulder problem. (*Id.*) The prescribed medications he was carrying

12 including: VICODIN and NSAID for back pain, and H2 blocker for GERD, and was taking

13 Metamucil. (Doc. # 31-1 at 3, 5; Doc. # 27-11 at 4, 6.)

14         Plaintiff was sent to HCC on July 12, 2011. (Doc. # 6 at 14 ¶ 24; Doc. # 27 at 8:18-19;

15 Doc. # 27-5 ¶ 5; Docs. # 29/30 at 2:23-24; Doc. # 30-1 at 2.) On July 18, 2011, Tina Atkinson,

16 Plaintiff's fiancé, called to obtain information about Plaintiff's term, and spoke to defendant

17 Suwe, who was working as a Classification and Planning Specialist for the NDOC Offender

18 Management Division (OMD). (Doc. # 27 at 8:22-26; Doc. # 27-9 ¶¶ 8-9; Docs. # 29/30 at 2-3;

19 Doc. # 30-3 (Suwe Decl.) ¶¶ 3, 5.) After Ms. Atkinson told Suwe Plaintiff's name, he looked

20 Plaintiff up using NOTIS, and recalled that Plaintiff was involved in an incident during his prior

21 incarceration in 2003. (Doc. # 30-3 (Suwe Decl.) ¶ 7.) Plaintiff does not dispute that when he

22 was incarcerated in June 2003 at NNRC, he and another inmate were discovered to be out of

23 bounds, which led to a search for the inmates, who were later discovered drinking alcohol in the

24 bushes along the Truckee River. (Doc. # 30-3 (Suwe Decl.) ¶¶ 7-9; Doc. # 27 at 7:25-26;

25 Doc. # 27-5 ¶ 15; Doc. # 37-4 ¶.)

26         Plaintiff contends that while the other inmate he was with did attempt to escape from

27 NNRC, he did not. (Doc. # 27-5 ¶ 15.) Suwe acknowledges that once the two inmates had been

28 taken into custody from the river, and were being prepared for transport, the other inmate fled.

(Doc. # 30-3 ¶ 9.) Suwe contends that following this incident, Plaintiff was transferred to another facility where he received a notice of disciplinary charges for, *inter alia*, being in an unauthorized area and out of place during count and for using alcohol, and this would have made him ineligible for minimum custody housing. (Docs. # 29/30 at 3:2-5; Doc. # 30-3 (Suwe Decl.) ¶ 10.) Defendants provide the notice of charges for being in an unauthorized area and failing to follow rules and regulations. (Doc. # 30-4 at 2.) The notice contains a statement from Correctional Officer Lucas who was assigned to locate Plaintiff and the other inmate on June 21, 2003. (*Id*.) He stated that Plaintiff and the other inmate were eventually located on the back end of the NNRC property, along the Truckee River, which was an area designated off limits to all NNRC residents. (*Id*.) Defendants also provide a corresponding "Escape Log" which describes when NNRC officers discovered Plaintiff and the other inmate were missing, the search for them, and locating them out of bounds. (*Id*. at 4-5.) The inmates were secured in the visiting room, and NNRC was "back to normal operations." (*Id*. at 5.) Plaintiff was found guilty of the charges. (*Id*. at 9.)

Suwe contends that it appeared that this information had not been entered into NOTIS. (Doc. # 30-3 (Suwe Decl.) ¶ 10.)

According to Atkinson, when she told Suwe Plaintiff's name, he said: "I remember this guy, he's an escapee! He shouldn't be in camp; I'll fix that right now." (Doc. # 27-9 (Atkinson Aff.) ¶ 10.) Suwe claims that when he recalled this prior incident, he advised Ms. Atkinson that Plaintiff was not eligible for NNRC, or even for HCC. (Doc. # 30-3 (Suwe Decl.) ¶ 11.) He contends that he told her that pursuant to AR 521.04.B8 an escape or attempted escape disqualifies an inmate from minimum custody. (*Id*.)

At that point, Plaintiff and Ms. Atkinson contend that Suwe entered the escapee information into NOTIS. (Doc. # 27 at 9:2-5; Doc. # 27-9 ¶ 12.) Suwe asserts that when he concluded his telephone conversation with Ms. Atkinson, he notified HCC staff and his supervisor, Rex Reed, and Pam Del Porto (NDOC's Inspector General) of the situation, and asked that Plaintiff be secured and transferred to LCC, the nearest medium security facility. (Doc. # 30-3 (Suwe Decl.) ¶ 12.) When he was informed later that day of Plaintiff's transfer, he

acknowledges that he entered a "warning casenote" into NOTIS "indicating that due to the nature of the event at NNRC in 2003, [Plaintiff] was to be considered not eligible for minimum custody." (*Id.* ¶ 13.) He maintains he did not ever enter a charge of "escape" into Plaintiff's record. (*Id.*)

> The NOTIS entries for July 18, 2011 are as follows:
> 7/18/2011-01:26 [Warning Case Note/Warning]: I/M never eligible MIN/317/184 - was assigned as Min/Cook at NNRRC in june 2006 and he along with another Min cook ... left the assigned area and went down to river where they were drinking. This was not discovered for quite some time. When staff discovered they were not in the culinary nor in the housing unit a perimeter search was done and they were not found causing the facility to go to Yellow Alert and then Red Alert. When additional staff arrived a more extensive search revealed the 2 inmates with a civilian hiding in brush along the truckee drinking. They were brought back into the facility and while being processed for transfer to WSCC, [the other inmate] fled out the door and was on escape status for several weeks resulting in CS sentence for escape. Due to the circumstances of the incident, [Plaintiff] is not eligible for Min or Res. Con. ... [SSUWEE updated the case note on 11/15/2001 09:29:59] CORRECTION: EVENT TOOK PLACE IN   JUNE 2003 NOT 2006
> 7/18/2011   -   01:46   [Classification   /   Re-Classification   (Change)]: Reclass/Change/LCC. Per OMD not eligible for Minimum. PTS=5. Serving 1.00 to 4.00 years for Possession of Stolen Property. PED 11/22/2011 MRP 10/02/2012 EXP 03/09/2013. No separates listed. No holds/detainers listed. DEN 1/1 MED 1/9, 10 MH 1/1. Per OMD inmate needs to be transferred to more secured institution. RX TX to LCC. LCC sending transport.
> Waters/Rutherford ... [DDEAL updated the case note on 7/18/2011 13:59:22] Approved MED/LCC/GP (refer to 7-18-11 warning chrono). Per Steve Suwe No MIN ever because of this incident. Im secured and LCC currently enroute to pick Im up for transport. IRD set to maintain periodic review schedule.

(Doc. # 27-8 at 8.)

Plaintiff was transferred from HCC to LCC that same day. (Doc. # 27-8 at 3; Doc. # 30-1 at 2.)

Plaintiff sent an informal level grievance on July 19, 2011 (grievance 2006-29-26555), describing Suwe's alleged action of stating that Plaintiff was an escapee and his transfer to HCC, asserting that he never was charged for an escape, and requesting to be sent back to HCC. (Doc. # 27-19 at 102-103.) In response he was advised that no inmate has a right to any custody level or housing. (*Id.* at 101.) He was told that when he was previously assigned to NNRC, he left his assigned area and went to the river where he was found drinking with another inmate and a civilian. (*Id.*) As a result, OMD determined that he would not be considered for minimum custody. (*Id.*)

On August 8, 2011, he sent a first level grievance. (Doc. # 27-19 at 97-99.) He stated that on intake he was classified to minimum custody, but after his fiancé called and spoke to Mr. Suwe, he was transferred to medium custody, even though when he had been back in prison in 2006 he had been permitted to maintain minimum custody. (*Id.*) He requested a full classification review and to be sent back to minimum custody. (*Id.*)  In response, he was advised that based on his actions at NNRC, OMD determined he was a poor candidate for minimum custody. (*Id.* at 96.)

Plaintiff sent a second level grievance on August 31, 2011. (Doc. # 27-19 at 93-95.) He cited AR 506.03 which states that he should have received a classification hearing upon transfer, and asked why he had not yet received one. (*Id.*) The response to the previous level grievances was upheld. (*Id.* at 91.)

Plaintiff sent another first level grievance around September 20, 2011, maintaining he had never tried to escape, and asking for a full classification hearing. (Doc. # 27-19 at 7.) He was advised that he had been submitted for full classification and would be notified as soon as the hearing was set. (*Id.*)

In a grievance around September 28, 2011, Plaintiff complained of issues with his caseworker, and raised the issue of his classification. (Doc. # 27-19 at 6.) In response he was told he was on the list to be seen by the full classification committee, "but in the meantime, your classification has been reviewed by Offender Management and the Associate Warden at LC and you are classified to the appropriate custody level." (*Id.*)

Plaintiff attended a full classification hearing on November 9, 2011, and the committee denied Plaintiff's request to reduce his custody level from medium to minimum. (Doc. # 27-19 at 4.) Plaintiff filed a grievance regarding the decision. (*Id.*) He was advised that his request for a custody status reduction was denied due to a discretionary exclusion under Administrative Regulation (AR) 521.04.3.C, which allows the committee to consider other relevant factors, which included the incident in June 2003 at NNRC. (*Id.*)

AR 503 governs classification. (Doc. # 27-2.) It provides that the following are taken into consideration when a classification determination is made: "The institutional files (I-File), the

1   Nevada Offender Tracking Information System (NOTIS) information, any information presented

2   by the inmate, and other interested parties and any other relevant information obtained and

3   formatted in NOTIS..." (Doc. # 27-2 at 2, AR 503.01.1.) In the case of an emergency transfer,

4   "Due process classification should be conducted by the receiving institution within 3 working

5   days after timely notice has been given to the inmate." (Doc. # 27-2 at 4, AR 503.04.3.B(1).)

6   Transfers between institutions require approval by OMD. (*Id*. at 5, AR 503.06.1.C.)[6]

7        **2. Count V–Due Process**

8          **a. Argument**

9        Plaintiff first acknowledges that he did not have a liberty interest in his classification

10  status, but nonetheless appears to argue that Suwe's conduct violated his substantive due process

11  rights because Suwe's action of entering the false notation in NOTIS was "shocking" because he

12  contends that Suwe knew his conduct would result in Plaintiff being reassigned to a facility with

13  a higher custody level, which would lengthen his term of incarceration. (Doc. # 27 at 16-18.)

14       Initially, Defendants contend that AR 521 does not require an actual conviction or

15  discipline for an escape to disqualify an inmate from minimum custody; rather, it is within the

16  discretion of OMD. (Docs. # 29/30 at 4:12-14.)

17       Next, Defendants point out that Plaintiff admits he has no constitutionally protected

18  interest in being assigned to any particular custody level. (Docs. # 29/30 at 16.) Despite this

19  admission, Plaintiff still contends that he was not granted a timely classification hearing in

20  violation of his due process rights. (*Id*.) Even if Plaintiff had not made this admission,

21  Defendants argue Plaintiff has not demonstrated any protected interest because he cannot

22  establish that moving from minimum to medium custody amounted to an atypical and significant

23  hardship. (*Id*. at 17.) Because he has no constitutionally protected interest in his custody level,

24  Defendants maintain they are entitled to summary judgment on any due process claim. (*Id*. at 16-

25  _____

26       [6] In support of his motion, Plaintiff provides an audit report regarding the accuracy of criminal history

27  information from 2013. (Doc. # 27-24 at 2-51.) The audit is not relevant to Plaintiff's claims. The audit was investigating claims that NOTIS contained potentially false offenses and other errors in an inmate's criminal history information, including the PSI and judgment of conviction. The errors that were found in the system for the most

28  part were of no consequence, and as it pertains to Plaintiff's case, did not revolve around the inclusion of a false notation in NOTIS, as Plaintiff has alleged here.

1   17.)

2   Defendants then argue that Plaintiff's substantive due process theory should be rejected.

3   (Docs. # 29/30 at 24.) They contend that as a result of Suwe's actions of adding the warning

4   casenote regarding the 2003 incident at NNRC, no additional time was added to Plaintiff's

5   sentence. (Docs. # 29/30 at 25.)

6   In his response, Plaintiff argues that Suwe did not simply review the file and update the

7   information, and that Suwe's statement that Plaintiff was not eligible for minimum custody is not

8   credible because there was an intervening incarceration where Plaintiff was listed as eligible to

9   return to minimum custody. (Doc. # 37 at 3.) Plaintiff further maintains he never attempted to

10  escape and was never charged as such. (*Id*.) He states that Suwe's action of placing making the

11  change in NOTIS was in retaliation for the loss of his position. (*Id*.)

12  Next, Plaintiff challenges Suwe's statement that he entered the warning casenote when he

13  realized the information regarding the 2003 incident was not reflected in NOTIS. Plaintiff asserts

14  that Suwe had already entered the information regarding the 2003 incident in 2007, and

15  intentionally re-entered it in 2011 to trigger Plaintiff's removal from HCC. (*Id*. at 4.) He points to

16  a January 10, 2007 entry in NOTIS. (*Id*.) The entry for that date states: "1/10/2007 - 09:57

17  [General Case Notes / General Case Note]: SUWE- STAFFED AT OMD. I/M WAS

18  MIN/COOK/NNRC PRIOR TO PAROLE AND FAILED IN A CT ENVIRONMENT.

19  DEEMED NOT APPROPRIATE FOR CGTH." (Doc. # 27-8 at 7.)

20  Finally, Plaintiff contends that there are no regulations imposed to protect the civil rights

21  of inmates within NDOC in this regard. (*Id*. at 4.) He further argues that the regulations do not

22  allow an inmate to add information to an inmate's file that is incorrect without notice to the

23  inmate, and in this case Plaintiff did not receive a classification hearing for four months after his

24  transfer. (*Id*. at 5.) He asserts that he may not have a constitutional interest in his classification

25  status, but he has a constitutional interest against being unjustly accused (presumably, of being

26  an escapee) without notice and a hearing. (*Id*.)

27  **b. Analysis**

28  Plaintiff misapprehends the nature of due process rights, whether procedural or

- 20 -

1  substantive, in this context.

2  **1. Procedural Due Process**

3      The Fourteenth Amendment provides, "[n]o State shall...deprive any person of life,

4  liberty, or property, without due process of law." U.S. Const.  amend XIV, § 1. To invoke its

5  protections, an inmate "must establish that one of these interests is at stake." *Wilkinson v.*

6  *Astrue*, 545 U.S. 209, 221 (2005); *see also Wolff v. McDonnell*, 418 U.S. 539, 558 (1974);

7  *Chappell v. Mandeville*, 706 F.3d 1052, 1062 (9th Cir. 2013). Once the plaintiff has established

8  that one of these interests is at stake, the court's analysis turns to whether the inmate suffered a

9  denial of adequate procedural protections. *See Biggs v. Terhune*, 334 F.3d 910, 913 (9th Cir.

10  2003) (citations omitted). Thus, with respect to procedural due process, a prerequisite to

11  establishing a constitutional violation is demonstrating that the plaintiff was deprived of a liberty

12  interest. Only if this initial hurdle is overcome does the court look to whether the proper

13  procedural protections were provided.

14      "A liberty interest may arise from the Constitution itself, by reason of guarantees implicit

15  in the word 'liberty,'... or it may arise from an expectation or interest created by state laws or

16  policies[.]" *Wilkinson*, 545 U.S. at 221 (citing *Vitek v. Jones*, 445 U.S. 480, 493-94 (1980)

17  (finding a liberty interest in avoiding involuntary psychiatric treatment and transfer to mental

18  institution under Due Process Clause itself) and *Wolff v. McDonnell*, 418 U.S. 539, 556-558

19  (1974) (finding a liberty interest in avoiding withdrawal of state-created system of good-time

20  credits)); *see also Chappell*, 706 F.3d at 1062 (citing *Mendoza v. Blodgett*, 960 F.2d 1425, 1428

21  (9th Cir. 1992)).

22      First, under the Constitution itself, a liberty interest is implicated when the conditions of

23  confinement "[exceed] the sentence in such an unexpected manner as to give rise to protection

24  by the Due Process Clause of its own force." *Mitchell v. Dupnik*, 75 F.3d 517, 523 (9th Cir.

25  1996) (internal quotation marks and citation omitted); *see also Chappel*, 706 F.3d at 1062-63

26  (citations and internal quotation marks omitted) ("[a]s long as the conditions or degree of

27  confinement to which the prisoner is subjected is within the sentence imposed upon him and is

28  not otherwise violative of the Constitution, the Due Process Clause does not in itself subject an

1    inmate's treatment by prison authorities to judicial oversight.") (holding that "investigative
2    contraband watch is the type of condition of confinement that is ordinarily contemplated by the
3    sentence imposed."). The Ninth Circuit has recognized that "only the most extreme changes in
4    the conditions of confinement" such as "involuntary commitment to a mental institution" and
5    "forced administration of psychotropic drugs" have been found to "directly invoke the
6    protections of the Due Process Clause." *Chappel*, 706 F.3d at 1063 (citing *Vitek v. Jones*, 445
7    U.S. 480, 493-94 (1980) and *Washington v. Harper*, 494 U.S. 210, 221-22 (1990)). Other
8    circumstances where a liberty interest has been found as arising from the Due Process Clause
9    itself include: revocation of probation, *Gagnon v. Scarpelli*, 411 U.S. 778 (1973); revocation of
10   parole status (not just mere denial of parole), *Morrissey v. Brewer*, 408 U.S. 471 (1972), and
11   labeling an inmate as a sex offender**,** *Neal v. Shimoda*, 131 F.3d 818 (9th Cir. 1997).

12       In *Meachum v. Fano*, the Supreme Court specifically held that "the Constitution itself
13   does not give rise to a liberty interest in avoiding transfer to more adverse conditions of
14   confinement." *Meachum v. Fano*, 427 U.S. 215, 225 (1976). "The Constitution does not ...
15   guarantee that the convicted prisoner will be placed in any particular prison[.]" *Meachum*, 427
16   U.S. 224. "The conviction has sufficiently extinguished the defendant's liberty interest to
17   empower the State the confine him in *any* of its prisons." *Id.* (emphasis original). Nor "does the
18   Due Process Clause in and of itself protect a duly convicted prisoner against transfer from one
19   institution to another within the state prison system. Confinement in any of the State's institutions
20   is within the normal limits or range of custody which the conviction has authorized the State to
21   impose." *Id*. at 225. Accordingly, the Constitution does not provide Plaintiff with a liberty
22   interest in avoiding his classification change and transfer from HCC to LCC.

23       Second, "[a] state may create a liberty interest through statutes, prison regulations, and
24   policies." *Chappell*, 706 F.3d at 1063 (citing *Wilkinson v. Austin*, 545 U.S. 209, 222 (2005) and
25   *Neal v. Shimoda*, 131 F.3d 818, 827 (9th Cir. 1997). Such a liberty interest is "subject to the
26   important limitations set forth in *Sandin v. Conner*[.]" *Wilkinson*, 545 U.S. at 222 (citing
27   *Sandin*). *Sandin* rejected the previously employed approach for evaluating whether there was a
28   state-created liberty interest which looked at the mandatory language of statutes and prison

regulations. *See id*. (citing *Sandin*, 515 U.S. at 481). Instead, *Sandin* directed that it was more important to look at the "nature of the deprivation." *Id*. (citing *Sandin*, 515 U.S. at 481). After *Sandin*, courts have looked at whether the conditions imposed on the prisoner result in an "atypical and significant hardship ... in relation to the ordinary incidents of prison life," *Sandin*, 515 U.S. at 483-84, or whether the conditions imposed will inevitably increase the duration of the inmate's period of incarceration, *see Wilkinson*, 545 U.S. 211.

Plaintiff concedes he did not have a liberty interest in avoiding transfer from HCC to LCC, but persists in his argument that he should have been provided with procedural protections including advance notice of his transfer and a classification hearing within three days of his transfer. Plaintiff continually ignores the fact that establishing a liberty interest is a *prerequisite* to being provided with procedural protections.

Plaintiff seems to acknowledge that he cannot establish a liberty interest based on the Due Process Clause alone. He then appears to argue that he has a liberty interest arising from NDOC's regulations (Doc. # 37 at 5-8); however, he fails to demonstrate that the conditions imposed on him as a result of his transfer gave rise to an atypical and significant hardship or that the conditions imposed increased the duration of his sentence. His dispositive motion and response to Defendants' cross-motion are simply devoid of such evidence.

While courts have not established a baseline for determining whether conditions amount to an atypical and significant hardship, the circumstances under which a liberty interest has been found to exist creates a substantial hurdle for a plaintiff bringing this type of claim. For example, in *Wilkinson*, 545 U.S. at 223-224, the inmate was assigned to a supermax facility where almost all human contact was prohibited, lights were on twenty-four hours a day, exercise was limited to one hour per day in a small indoor room for an indefinite period of time with only annual review, and resulted in the inmate's disqualification from parole consideration. In *Brown v. Oregon Dept. of Corr.*, 751 F.3d 983, 985 (9th Cir. 2014), the inmate was placed in intensive management unit for twenty seven consecutive months, consisting of solitary confinement twenty-three hours a day with strict limitations on time outdoors and restrictions on visitor access, law library access, group religious worship, education and vocational opportunities, telephone usage, and access to

1  personal property). Plaintiff has presented no evidence regarding the conditions he faced at LCC,

2  let alone conditions that might be akin to those described in *Wilkinson* and *Brown*.

3      Plaintiff argues in his reply brief that while he may not have been deprived of a liberty

4  interest as a result of his change in classification and transfer, he was deprived of a liberty

5  interest when he was falsely charged as an escapee without notice and a hearing. Plaintiff cites

6  *Wolff v. McDonnel*, 418 U.S. 539, 556 (1974) to support his position. (Doc. # 37 at 6.) As the

7  court interprets his argument, he contends he was entitled to notice and a hearing before his

8  classification change and transfer because Suwe's alleged entry of the information regarding the

9  2003 incident amounted to a disciplinary charge for an escape or attempted escape.[7]

10     Plaintiff's argument is misplaced. After the 2003 incident occurred he was charged with

11 being in an unauthorized area and for drinking. To this day, he admits that he was out of bounds

12 at NNRC, and that he was drinking. There was never an escape charge or attempted escape

13 charge brought against Plaintiff, either when the incident occurred in 2003 or after Suwe's entry

14 of the information into NOTIS. Instead, the information was placed in his NOTIS report by

15 Suwe, and was the basis for Plaintiff's change in classification. NDOC's regulations provide that

16 a classification determination can be based on any relevant factor. (Doc. # 27-2 at 2, AR

17 503.01.1.) That an inmate was found to be out of bounds and drinking at a minimum custody

18 facility in the past can undoubtedly be considered relevant information for classification

19 purposes. It is immaterial that the officials in charge of classification did not take this incident

20 into account in connection with his intervening incarceration. They chose to take it into account

21 with respect to this most recent incarceration, and determined Plaintiff was ineligible for

22 minimum custody. More importantly, however, is the fact that Plaintiff was not subject to a

23 disciplinary charge to trigger the procedural protections outlined in *Wolff*.[8]

---

24

25 [7] Insofar as Plaintiff contends that he should have been provided with notice and a hearing because the Due

26 Process Clause itself entitles him to this protection as a result of the alleged false escape charge, the Supreme Court rejected this position in *Montayne v. Haymes*, 427 U.S. 236, 242 (1976) (rejecting proposition "that the Due Process Clause by its own force requires hearings whenever prison authorities transfer a prisoner to another institution

27 because of his breach of prison rules" and holding the Due Process Clause "does not require hearings in connection with transfers whether or not they are the results of the inmate's misbehavior or may be labeled as disciplinary or

28 punitive").

[8] In *Wolff*, the Supreme Court concluded that the State created a statutory right to good time credit which is

Finally, Plaintiff does not provide evidence that his transfer to LCC or affected the length of his sentence in any way.

In sum, Plaintiff has not demonstrated that he had a protected liberty interest in avoiding a transfer from HCC to LCC. Nor did he have a liberty interest in avoiding the entry of the information about the 2003 incident into his NOTIS record. Therefore, the court need not reach the question of whether he was provided with the proper procedural protections. The court recommends that Defendants' Cross-Motion for Summary Judgment be granted and Plaintiff's Motion for Summary Judgment be denied with respect to Plaintiff's procedural due process claim in Count V.

### 2. Substantive Due Process

Second, Plaintiff does not establish a violation of his substantive due process rights. Substantive due process protects individuals from arbitrary and unreasonable government action which deprives any person of life, liberty or property. *Wolff v. McDonnell,* 418 U.S. 539, 558 (1974); *Kawaoka v. City of Arroyo Grande,* 17 F.3d 1227, 1234 (9th Cir. 1994). To establish a substantive due process violation, the government's action must be shown to be "clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals or general welfare." *Sinaloa Lake Owners v. Simi Valley,* 882 F.2d 1398, 1407 (9th Cir. 1989) (citation and quotation marks omitted). Conduct that violates notions of substantive due process is said to be that which "shocks the conscience." *County of Sacramento v. Lewis,* 523 U.S. 833, 846 (1998) (citing as examples, *Rochin v. California,* 342 U.S. 165, 172-73 (1952) (forced pumping of suspect's stomach "shocks the conscience"); *Breithaupt v. Abram,* 352 U.S. 432, 435 (1957) (conduct that was so "brutal" and "offensive" that it did not "comport with traditional ideas of fair play and decency"); *Whitley v. Albers,* 475 U.S. 312, 327 (1986) (same); *United States v. Salerno,* 481 U.S. 739, 746 (1987) (same)).

"[T]he due process guarantee does not entail a body of constitutional law imposing

---

forfeited when the inmate engages in serious misbehavior, which gave rise to a liberty interest so that the inmate was entitled to certain minimum procedural protections in the context of disciplinary proceedings, including at least twenty-four hours advance notice of the hearing, a written statement of evidence relied on and reasons for the disciplinary action taken, the opportunity to call witnesses and present documentary evidence . *Wolff v. McDonnell*, 418 U.S. 539 (1974).

liability whenever someone cloaked with state authority causes harm." *Lewis*, 523 U.S. at 848. Nor does "the Constitution [ ] guarantee due care on the part of state officials[.]" *Id*. (citations omitted). Instead, "'[h]istorically, this guarantee of due process has been applied to *deliberate* decisions of government officials to deprive a person of life, liberty, or property." *Id*. at 849 (quoting from *Daniels v. Williams*, 474 U.S. at 331)).

Even if the court accepts as true Plaintiff's contention that Suwe intended to place the information in his NOTIS record so that Plaintiff would be transferred from HCC to LCC, this is not the type of conduct that "shocks the conscience." Suwe could not have intended to deprive Plaintiff of his liberty interest because, as the court discussed, *supra*, Plaintiff had no liberty interest in his classification status or in staying at a particular facility within NDOC. As such, the court concludes that Plaintiff's Motion for Summary Judgment should be denied, and Defendants' Cross-Motion for Summary Judgment should be granted as to the substantive due process claim in Count V.

### 3. Counts I and II-Fourth Amendment

Defendants move for summary judgment as to Plaintiff's Fourth Amendment claims in Counts I and II. (Docs. # 29/30 at 8-11.) Plaintiff does not address these claims in his own Motion for Summary Judgment.

As stated, *supra*, the Fourth Amendment claim in Count I is for false arrest and fabrication of evidence against defendant Suwe, and is based on the allegation that Suwe placed the false escape note in Plaintiff's NOTIS file at HCC, which resulted in the issuance of a lockdown and Plaintiff's detention and transfer to LCC. (Doc. # 6 at 30.) In Count II, Plaintiff titles his claim "failure to keep from harm" against Suwe, and alleges that NDOC's policy did not limit employees' ability to change criminal history and sentence information, and if it had, it would have prevented Plaintiff's detention and transfer. (Doc. # 6 at 32.)

Suwe argues that he did not fabricate evidence or enter a false arrest charge into Plaintiff's NOTIS record; instead, Suwe entered information about the 2003 incident where Plaintiff was in an unauthorized area into Plaintiff's NOTIS record when he discovered the information was not there. (Doc. # 29 at 9.) As a result, Plaintiff was not eligible for minimum

custody. (*Id.*) Suwe maintains that Plaintiff was not charged with an escape, nor was such a charge entered into his record; Plaintiff was previously disciplined for his offense. (*Id.*)

Plaintiff maintains that Suwe fabricated evidence. (Doc. # 37 at 10.) He asserts that Suwe's statement that Plaintiff was ineligible for minimum custody is not true because Plaintiff was placed in minimum custody with respect to his intervening incarceration. (*Id.*) Plaintiff also asserts that Suwe's statement that he made the entry after Plaintiff was transferred is not true because the documents show Plaintiff was transferred after the entry, which was made within six minutes of the termination of the phone call between Suwe and Ms. Atkinson. (*Id.*)

The evidence is clear that regardless of when he did it (either shortly after his conversation with Ms. Atkinson or after Plaintiff's transfer to LCC), Suwe added a warning casenote to NOTIS stating that when Plaintiff was assigned to minimum custody at NNRC as a cook, he and another inmate left the assigned area and went down to the river where they were drinking. (Doc. # 27-8 at 8, 7/18/11 entry.) He stated that this was not discovered for some time and when staff discovered Plaintiff and the other inmate were not in the culinary or their housing unit, NDOC commenced a unit perimeter search, and when they were not found the facility went into yellow and then red alert status. (*Id.*) A more extensive search was conducted and the inmates were found with a civilian hiding in the brush along the Truckee River and drinking. (*Id.*) They were brought to the facility and while being transferred to LCC, *the other inmate* (and *not Plaintiff*) fled out the door and was on escape status for several weeks resulting in CS sentence for escape. (*Id.*) The warning casenote states that "due to the circumstances of the incident [Plaintiff] is not eligible for Min or Res Con..." (*Id.*)

The casenote entry is consistent with Plaintiff's own admission that he was in an "off limits" area within NNRC and was drinking. It is also consistent with the documentation concerning the incident, which reflects that it was the other inmate, and not Plaintiff that was charged with an escape. To be clear, no escape charge was brought against Plaintiff following the incident. Nor did the July 18, 2011 casenote warning entered by Suwe indicate that an escape charge was being brought against Plaintiff. Instead, Suwe, as part of the OMD, utilized the circumstances surrounding the 2003 incident in his determination that Plaintiff should not be

eligible for minimum custody status. There is absolutely no evidence to support the claim that Suwe fabricated evidence or falsely arrested Plaintiff. The fact that Plaintiff was assigned to minimum custody status while he was incarcerated in between the 2003 incident and his re-incarceration in 2011 is immaterial to the classification determination made in this instance.

Notably, Plaintiff cites no authority to support his position that Suwe's action—entering the details of the June 2003 incident into NOTIS and using this in his determination that Plaintiff should not be classified to minimum custody—violates the Fourth Amendment.[9] The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend IV. Plaintiff appears to premise his Fourth Amendment claim on a theory that he was improperly "detained" or perhaps that he was improperly "arrested" as a result of the entry of the information into NOTIS by Suwe. As stated above, Plaintiff was never charged with an escape or attempted escape; therefore, there is no credibility to his statement that he was placed under arrest. Moreover, he was already in the lawful custody of NDOC; so, he could not have been wrongfully "detained" prior to his transfer to LCC. He was merely transferred from one NDOC facility to another after a determination was made about his classification status based on the circumstances surrounding the incident that occurred in June 2003. As such, Plaintiff's Fourth Amendment claims in Counts I and II fail.

Therefore, the court recommends that summary judgment be granted in Defendants' favor as to Counts I and II.

**C. Deliberate Indifference to Serious Medical Needs**

**1. Dental Care Claim**

Plaintiff's motion references a delay in receiving dental care related to a broken tooth. (*See, e.g.,* Doc. # 27 at 13:21-22; 25:27; 28:1-2, 4-5.) In their opposition, Defendants argue that while the Amended Complaint and Plaintiff's motion reference his broken tooth, the Amended Complaint does not include an Eighth Amendment deliberate indifference claim directed toward

---

[9] Plaintiff's own motion does not even address his Fourth Amendment claims related to the fabrication of evidence and false arrest charge allegations. (Doc. # 27.) Plaintiff's response to Defendants' cross-motion is similarly devoid of a discussion of legal authority. (Doc. # 37.)

any NDOC medical or dental personnel, and Plaintiff cannot amend his complaint through his motion for summary judgment. (Docs. # 29/30 at 28.)

The recitation of facts portion of Plaintiff's Amended Complaint does make reference to the fact that he filed grievances related to pain he was suffering as a result of a broken tooth. (Doc. # 6 at 19 ¶ 45; 22 ¶¶ 63, 69; 23 ¶71; 24 ¶ 81.) Defendants are correct, however, that the Amended Complaint does not include an Eighth Amendment claim related specifically to dental care. Nor are the dental care allegations directed toward any particular defendant whom Plaintiff claims was responsible for the alleged unconstitutional delay.

Plaintiff argues, in essence, that Defendants waived any defect in this regard because they failed to bring a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). (Doc. # 37 at 8-9.) Defendants did not file a motion to dismiss; however, in order to meet his own burden on summary judgment, and to raise a genuine issue of material fact to defeat Defendants' motion, Plaintiff must show that the alleged unconstitutional conduct is attributable to a named defendant. This is because there can be no liability under 42 U.S.C. section 1983 unless there is some affirmative link or connection between a defendant's actions and the claimed deprivation. *See Rizzo v. Goode*, 423 U.S. 362 (1976); *May v. Enomoto*, 633 F.2d 164, 167 (1980).

In responding to Defendants' motion for summary judgment, Plaintiff still fails to identify any defendant to whom he attributes the alleged lack of responsiveness for dental issues. Nor does he establish any connection between the alleged delay in receiving dental care to any of the currently named defendants. Accordingly, Plaintiff's Motion for Summary Judgment should be denied and Defendants' Cross-Motion for Summary Judgment should be granted insofar as Plaintiff's Amended Complaint can be construed as asserting an Eighth Amendment deliberate indifference claim related to his dental care at LCC and NNCC between July 2011 and February 2012.

**2. Facts Re: Remaining Medical Care Claims**

When Plaintiff arrived at NDOC on June 8, 2011, an intake health screening form was completed. (Doc. # 31-1 at 2.) It noted no obvious pain, but stated that Plaintiff's mobility was restricted; that he had a torn ACL on the right knee; and a left shoulder problem. (*Id*. at 2.) When

he came to prison he reporting taking Vicodin and an NSAID for back pain, and a H2 blocker for GERD, along with Metamucil. (*Id.* at 3, 5.) When he transferred to HCC, the only medical problem noted was constipation. (Doc. # 27-17 at 14; Doc. # 27-20 at 4.) When he transferred from HCC to LCC, on July 18, 2011, no medical or dental problems were noted. (Doc. # 27-17 at 13; Doc. # 27-20 at 3.)

On July 24, 2011, Plaintiff sent a kite stating that his shoulder hurt: "My shoulder is hurting me! I was in a car accident & my shoulder hurts all the time to lift above my head or to lay on." (Doc. # 27-16 at 30; Doc. # 31-2 at 38.) On July 25, 2011, he sent another kite: "I was involved in a car accident a year ago hurt my shoulder I thought I was fine but I was at HCC and placed in handcuffs. I felt something tear in my shoulder. Now I can barely move it and it hurts extremely bad." (Doc. # 27-16 at 31; Doc. # 31-2 at 39.) D. Williams' response dated July 26, 2011, gave his vital signs and stated: "L shoulder  Monday 7-." (*Id.*)

Plaintiff was seen for his complaints of left shoulder pain on July 26, 2011. (Doc. # 27-17 at 26; Doc. # 31-3 at 9.) He said he had significant pain and decreasing range of motion, which was exhibited upon examination, along with slight swelling on the scapula. (*Id.*) He was prescribed an ibuprofen pack and analgesic balm and was instructed to kite to see Dr. Scott. (*Id.*; Doc. # 27-17 at 18, 31; Doc. # 31-4 at 5.)

Plaintiff saw Dr. Scott the following day, July 27, 2011. (Doc. # 27-17 at 26; Doc. # 31-3 at 9.) He complained of left shoulder pain and a lump on his testicle. (*Id.*) Dr. Scott prescribed him 800mg of ibuprofen, analgesic balm,  advised him on range of motion exercises, ordered a CBC panel and ordered him to return to the clinic in two to three weeks with respect to his testicular lump. (Doc. # 27-17 at 18, 25, 32; Doc. # 31-4 at 5.)

On August 9, 2011, Plaintiff sent a kite stating that he had seen Dr. Scott for his shoulder, but the pain was getting worse and he requested a second opinion. (Doc. # 27-16 at 28.) He sent another kite to defendant Poag on August 13, 2011, again asking for a second opinion and for the results of the blood test regarding his testicular lump. (Doc. # 27-16 at 29; Doc. # 31-2 at 31.) He received this response: "You'll see the doctor when the test results are back. I suggest you discuss treatment options for your shoulder with him." (*Id.*)

- 30 -

1    He filed a grievance on August 20, 2011. (Doc. # 27-19 at 14-15, 66-68.)

2    Plaintiff sent a kite on August 21, 2011, stating the following: "I have made repeated

3    requests to be seen by a doctor for an injury sustained from a N.D.O.C. officer on 7/18/11 at the

4    H.C.C. facility. I have filed grievances even, yet you refuse my treatment! I need to be seen, and

5    have an x-ray done on my shoulder!" (Doc. # 27-16 at 25; Doc. # 31-3 at 9.) He was told that he

6    had been advised he was scheduled for a follow up appointment. (*Id*.)

7    Plaintiff was seen by Dr. Scott again on August 25, 2011 regarding his testicular mass,

8    persistent left shoulder pain and an infection. (Doc. # 27-17 at 25; Doc. # 31-3 at 8.) Dr. Scott

9    recommended that Plaintiff be transferred to NNCC for an evaluation of the testicular mass, and

10   ordered several medications, including Zantac, Tums, and Tetracycline. (*Id*.; Doc. # 27-17 at 18;

11   Doc. # 31-4 at 5.)

12   He sent a grievance the very next day, claiming Dr. Scott did nothing to help him. (Doc.

13   # 27-19 at 57-58.)

14   On August 31, 2011, Dr. Scott asked that Plaintiff be referred to Dr. Mar at NNCC

15   regarding his testicular mass. (Doc. # 27-17 at 54.)

16   Plaintiff sent an emergency grievance on September 1, 2011, stating that he went to sick

17   call but was given no medical examination for his broken tooth, shoulder injury, infection,

18   testicular cancer or heartburn. (Doc. # 27-19 at 31-34.)  He said that he was supposed to have

19   received tetracycline for his infection, Prilosec for his heartburn, and ibuprofen/Aspirin for pain,

20   but was told at sick call that they forgot to order the medications for his heartburn and infection.

21   (*Id*.) He asked for a medical examination, x-rays and medication. (*Id*.) In response he was told:

22   "This is not an emergency per AR 740. Medical is aware of your situation. (*Id*. at 31.)

23   He sent another grievance on September 2, 2011, referencing various issues, including

24   his shoulder pain. (Doc. # 27-19 at 45-47.) In response, he was told a senior physician had

25   evaluated him, and a request for referral to NNCC was pending authorization. (*Id*. at 44.)

26   Plaintiff sent a kite dated September 11, 2011, regarding left shoulder pain as well as his

27   testicular mass. (Doc. # 27-16 at 24; Doc. # 31-2 at 28.) Plaintiff was seen on September 13,

28   2011, and it was noted that he would transferred very soon for evaluation. (Doc. # 27-17 at 24;

1    Doc. # 31-3 at 7.) He was prescribed a ibuprofen pain pack. (*Id.*; Doc. # 27-17 at 17, 31.)

2            On September 14, 2011, Plaintiff filed an emergency grievance, stating that he was

3    diagnosed with testicular cancer[10] on July 28, 2011, and was told he would be transferred for

4    evaluation; then, when he saw Dr. Scott the day before (September 13, 2011), Dr. Scott asked

5    why he was still there and had not transferred. (Doc. # 27-19 at 25.) Plaintiff responded that he

6    did not know, and Dr. Scott left and came back and told him he would be transferred. (*Id.*) He

7    asked why it was taking so long for the transfer, as he was still in pain. (*Id.* at 26.) In response,

8    he was told that he had been ordered to transfer to NNCC (as of August 25, 2011), and would be

9    transferred but "this is not an emergency as defined by A.R. 740." (*Id.* at 25.) He submitted

10   additional grievances on September 19 and 26, 2011. (Doc. # 27-19 at 8, 10.)

11          He was advised on September 27, 2011, that he had a pending appointment to have

12   imaging studies performed and that he had been prescribed medication for his discomfort. (*Id.* at

13   12.)

14          On September 27, 201, Plaintiff sent a kite regarding the pain in his shoulder and his

15   infection. (Doc. # 27-16 at 27; Doc. # 31-2 at 27.) Plaintiff was seen on September 28, 2011.

16   (Doc. # 27-17 at 24; Doc. # 31-3 at 7.) The progress notes mention complains of sores on the

17   body and left buttocks. (*Id.*) He was prescribed Bactrin for a possible staph infection. (*Id.*; Doc. #

18   27-17 at 17, 31.)

19          Plaintiff was transferred to NNCC on September 29, 2011. (Doc. # 30-1 at 2; Doc # 27-

20   17 at 12.) His chart was reviewed on September 30, 2011, and he was to be referred to a provider

21   for follow up concerning a right testicular mass and for dental issues. (Doc. # 27-17 at 23.)

22          On October 2, 2011, he sent a kite asking for more heartburn medication and was referred

23   to sick call. (Doc. # 27-16 at 20.)

24          Plaintiff was seen on October 3, 2011, regarding his left shoulder pain. (Doc. # 27-17 at

25   23; Doc. # 31-3 at 6.) It was noted he had decreased range of motion, fifty degree abduction, and

26   was positive for crepitus. (*Id.*) He was issued ibuprofen, and scheduled to be seen on October 19,

27

28          [10] The medical records do not reflect a *diagnosis* of testicular cancer; rather, they confirm a testicular mass, and recommended Plaintiff be sent to NNCC for further evaluation. Testicular cancer was ruled following an ultrasound performed while Plaintiff was at NNCC.

- 32 -

1    2011. (*Id*.)

2         Plaintiff kited medical on October 7, 2011, asking to see a doctor concerning his shoulder

3    pain. (Doc. # 27-16 at 19; Doc. # 31-2 at 23.) He was told to report to sick call to be checked.

4    (*Id*.) Plaintiff was seen at sick call on October 12, 2011, complaining of chronic left shoulder

5    pain. (Doc. # 27-17 at 23; Doc. # 31-3 at 6.) It was noted that he had a doctor's appointment on

6    October 19, and was issued ibuprofen and advised to keep his appointment. (*Id*.) On October 19,

7    2011, Dr. Gedney noted in his chart that Plaintiff's ultrasound (regarding his testicular mass) was

8    normal, and that Plaintiff was to be sent back to LCC. (Doc. # 27-17 at 23; Doc. # 31-3 at 6.) His

9    October 19, 2011 appointment was changed to October 27, 2011. (Doc. # 27-17 at 23; Doc. # 31-

10   3 at 6.)

11        On October 26, 2011, Plaintiff sent a letter to defendants Cox, Bannister, Palmer, Peery,

12   and Cortez Masto, advising them he had sent numerous kites and grievances regarding his left

13   shoulder, testicular mass, and broken tooth, and stated he was in pain and needed to be seen by a

14   doctor. (Doc. # 27-22 at 2-6.) He stated that he was writing to satisfy the "respondeat superior"

15   doctrine, and to let them know he was being denied competent medical care. (*Id*.)

16        Plaintiff saw Dr. Johns on October 27, 2011, complaining of a staph infection, GERD and

17   left shoulder pain. (Doc. # 27-17 at 22; Doc. # 31-3 at 5.) While most of Dr. Johns' notes are

18   difficult to read, she ordered an x-ray of the left shoulder, Zantac, Clindamycin, a referral to

19   Dr. Long at NNCC, Prednisone, and Maalox. (Doc. # 27-17 at 16; Doc. # 31-4 at 3; Doc. # 27-17

20   at 55.) The x-ray was performed, and the results were normal. (Doc. # 27-17 at 71.)

21        Plaintiff had a reaction to the Prednisone he had been prescribed, and was given

22   hydrocortisone cream and naproxen. (Doc. # 27-17 at 16.)

23        Plaintiff saw Dr. Long on November 2, 2011. (Doc. # 27-17 at 53; Doc. # 31-5 at 4.)

24   Dr. Long noted that Plaintiff was diffusely tender, primarily around the posterior shoulder rotator

25   cuff, and that his scapula winged out slightly. (*Id*.) He had limited range of motion, and pain with

26   abduction. (*Id*.) Dr. Long suspected a rotator cuff tear and was concerned about the winging of

27   the scapula. (*Id*.) He recommended an MRI. (*Id*.) They discussed pain management, and Plaintiff

28   said ibuprofen did not help. (*Id*.) Dr. Long told Plaintiff to speak with Dr. Gedney about this.

(*Id.*)

Plaintiff sent a kite on November 6, 2011, stating that his left shoulder hurt badly, and the infirmary pain reliever was not helping, and requested different pain medication. (Doc. # 27-16 at 4.) He was told in response to go to sick call. (*Id.*) It notes ibuprofen for pain. (*Id.*)

Plaintiff saw Dr. Gedney on November 12, 2011. (Doc. # 27-17 at 21.) She noted decreased range of motion in the shoulder as well as crunching. (*Id.*) She referred him back to Dr. Long. (*Id.*)

On November 17, 2011, Plaintiff sent a grievance stating that he was in extreme pain with respect to his shoulder. (Doc. # 27-19 at 5.) He was advised that he had seen Dr. Long, and if he was in severe pain he should report to sick call. (*Id.*)

Plaintiff was seen regarding his shoulder pain and heartburn on November 17, 2011. (Doc. # 27-17 at 20; Doc. # 31-3 at 3.) He was given ibuprofen and Tums, and was notified he would be scheduled for an MRI soon. (*Id.*)

On November 22, 2011, the request for the MRI of the left shoulder was approved, and an appointment for December 6, 2011 was noted. (Doc. # 27-17 at 60.)

The MRI of the shoulder was performed on December 6, 2011. (Doc. # 27-15 at 78; Doc. # 27-17 at 65; Doc. # 31-6 at 7-8.)

Plaintiff was seen for sick call on December 28, 2011, regarding pain in his left shoulder and heartburn. (Doc. # 27-17 at 20; Doc. # 31-3 at 3.) It was noted that he was scheduled to see the doctor on January 4, 2012 for gastrointestinal problems and for a follow up regarding his MRI. (*Id.*)

Plaintiff saw Dr. Gedney on January 4, 2012. (Doc. # 27-17 at 19; Doc. # 31-3 at 2.) She noted Plaintiff could not abduct greater than ninety degrees, and that his shoulder blade was winged. (*Id.*) She noted the results of the MRI, prescribed 40 mg of Xenalog and xylocaine in the joint for some joint relief, advised Plaintiff on light range of motion exercises. (*Id.*) She also discussed his gastrointestinal problems not resolving and changed his medication from Zantac to Prilosec. (*Id.*) She ordered that he see Dr. Long in January to follow up regarding the left shoulder MRI and to make a recommendation regarding surgery or rehabilitation. (Doc. # 27-17

at 15, 51.) She also prescribed Tums, Prilosec and ibuprofen. (Doc. # 27-17 at 15-16, 19, 51; Doc. # 31-3 at 2; Doc. # 31-4 at 2; Doc. # 31-5 at 2.)

Plaintiff saw Dr. Long on January 12, 2012. (Doc. # 27-17 at 52; Doc. # 31-5 at 3.) Dr. Long noted that the MRI revealed Plaintiff had AC joint arthritis, with a rotator cuff tear. (*Id*.) With respect to this problem, he stated: "He is due to be released in two weeks, therefore we're not going to recommend surgery at this time. He can do that on the outside." (*Id*.) Dr. Long also noted that Plaintiff "definitely has winging of the scapula." (*Id*.) With respect to this issue, he opined: "My bet is that he had a stretch injury to the plexus. I think it is a wait and watch injury." (*Id*.)

On January 17, 2012, Plaintiff came in to be seen for a "mandown" regarding a Tums refill, but exited before he was evaluated. (Doc. # 27-17 at 19.)

Plaintiff was apparently seen by Dr. Long again on January 22, 2012; however, the progress notes only state that dictation is to follow, but no notes are provided. (Doc. # 27-17 at 19.)

Plaintiff was released on parole on February 2, 2012. (Doc. # 30-1 at 2.)

He saw Dr. Mishler, outside of prison, regarding his left shoulder pain on April 2, 2012. (Doc. # 27-15 at 60-61.) He noted Plaintiff had a torn rotator cuff and winging scapula, requested various tests and eventually performed surgery on June 4, 2012. (*Id*. at 58-59, 75-76.) Following the surgery, he underwent physical therapy. (*Id*. at 55-56.) When he was still having issues with pain in the left shoulder as of February 26, 2013, Dr. Mishler noted the winging scapula, but stated he would not do any kind of surgery on it because it would restrict the range of motion in the shoulder and be more problematic. (Doc. # 27-15 at 62-63.) As of November 15, 2013, his left shoulder had improved, and Dr. Mishler said Plaintiff was "doing quite well." (Doc. # 27-15 at 50.)

Plaintiff provided an affidavit of Ross Waltz, MSPT, who stated that Plaintiff completed physical therapy, but could not completely heal the scapula, and the condition of his scapula impeded his ability to seek full range of motion in the shoulder after surgery. (Doc. # 27-15 at 15-16.)

**3. Standard**

A prisoner can establish an Eighth Amendment violation arising from deficient medical care if he can prove that prison officials were deliberately indifferent to a serious medical need. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "The requirement of deliberate indifference is less stringent in cases involving a prisoner's medical needs than in other cases involving harm to incarcerated individuals because '[t]he State's responsibility to provide inmates with medical care ordinarily does not conflict with competing administrative concerns.'" *McGuckin v. Smith*, 974 F.2d 1050, 1060 (9th Cir. 1992), *rev'd on other grounds, WMX Tech, Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997). "In deciding whether there has been deliberate indifference to an inmate's serious medical needs, [the court] need not defer to the judgment of prison doctors or administrators." *Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989).

A claim for deliberate indifference involves the examination of two elements: "the seriousness of the prisoner's medical need and the nature of the defendant's response to that need." *McGuckin*, 974 F.2d at 1059; *see also Akhtar v. Mesa*, 698 F.3d 1202, 1213 (9th Cir. 2012) (quoting *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006)). "A 'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin*, 974 F.2d at 1059 (citing *Estelle*, 429 U.S. at 104); *see also Akhtar*, 698 F.3d at 1213. Examples of conditions that are "serious" in nature include "an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *McGuckin*, 974 F.2d at 1059-60; *see also Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000) (citation omitted) (finding that inmate whose jaw was broken and mouth was wired shut for several months demonstrated a serious medical need).

If the medical need is "serious," the plaintiff must show that the defendant acted with deliberate indifference to that need. *Estelle*, 429 U.S. at 104; *Akhtar*, 698 F.3d at 1213 (citation omitted). "Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). Deliberate indifference entails something more than medical malpractice or

even gross negligence. *Id*. Inadvertence, by itself, is insufficient to establish a cause of action under section 1983. *McGuckin*, 974 F.2d at 1060. Instead, deliberate indifference is only present when a prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *see also Akhtar*, 698 F.3d at 1213 (citation omitted).

Deliberate indifference exists when a prison official "den[ies], delay[s] or intentionally interfere[s] with medical treatment, or it may be shown by the way in which prison officials provide medical care." *Crowley v. Bannister*, 734 F.3d 967, 978 (9th Cir. 2013) (internal quotation marks and citation omitted). "'[A] prisoner need not prove that he was completely denied medical care' in order to prevail" on a claim of deliberate indifference. *Snow v. McDaniel*, 681 F.3d 978, 987 (9th Cir. 2012) (quoting *Lopez*, 203 F.3d at 1132), *overruled on other grounds*, *Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014). Where delay in receiving medical treatment is alleged, a prisoner must demonstrate that the delay led to further injury. *McGuckin*, 974 F.2d at 1060.

"A difference of opinion between a physician and the prisoner—or between medical professionals—concerning what medical care is appropriate does not amount to deliberate indifference." *Snow*, 681 F.3d at 987 (citing *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). Instead, to establish deliberate indifference in the context of a difference of opinion between a physician and the prisoner or between medical providers, the prisoner "'must show that the course of treatment the doctors chose was medically unacceptable under the circumstances' and that the defendants 'chose this course in conscious disregard of an excessive risk to plaintiff's health.'" *Snow*, 681 F.3d at 988 (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)).

**4. Analysis**

Counts IV, VII, VIII, and IX encompass Plaintiff's claims for deliberate indifference to his serious medical needs under the Eighth Amendment. His allegations can be categorized as relating to: (a) his shoulder injury; (b) his gastrointestinal/heartburn issues; and (c) a generalized complaint about the inadequacy of medical care within NDOC. The court will analyze these

claims, in turn.

### a. Shoulder

#### i. Plaintiff's Argument

With respect to his shoulder, Plaintiff contends that he spent over seven months in pain and did not obtain relief until after he was released from prison and had surgery. (Doc. # 27 at 25:25-26.) He argues that he sent numerous kites and grievances about his condition, yet NDOC completely failed to treat him for the maladies afflicting his shoulder and clavicle. (*Id*. at 26-27, 28.)

#### ii. Defendants' Argument

Defendants argue that Plaintiff was not ignored, but instead, NDOC consistently acted to accommodate his complaints of pain, and nearly every time he sent a kite regarding his shoulder he was seen at sick call or scheduled for an appointment. (Doc. # 29 at 13.) They assert that Plaintiff was given pain medication, an x-ray, an MRI, and was seen by an orthopedic specialist, who did not recommend surgery because Plaintiff was scheduled to be paroled and would not have been able to have the surgery so soon. (*Id*. at 15.)

Defendants contend that the fact that Plaintiff later had surgery does not mean the treatment he received while incarcerated was inadequate. (*Id*. at 28.) They acknowledge that his grievances and affidavit state he was in pain, but contend the medical records show he was treated for his shoulder pain. (*Id*.)

Finally, Defendants argue that to the extent Plaintiff has included Dr. Bannister, Bellanger, Buchanan, Cox, Cortez Masto, Herrera, LeGrand, McDaniel, Palmer, Peery, and Waters on a theory of supervisory liability, he cannot demonstrate they had any personal involvement in any of the alleged actions, and cannot establish wrongful conduct on their part and show a causal connection between the conduct any alleged constitutional violation. (Docs. # 29/30 at 19-21.)

#### iii. Discussion

Plaintiff alleges that despite his complaints of shoulder pain during his time at LCC and NNCC, Dr. Scott, Dr. Johns, Dr. Gedney, and nurses Poag and Peery failed to properly diagnose

and treat him or refer him to a specialist in a timely manner. (Doc. # 6 at 33 ¶¶ 125, 126, 154.) Instead he claims he was left to agonize in pain for months, and left prison having received no meaningful treatment for his shoulder. (*Id*. ¶¶ 129-132.)

He further alleges that supervisory officials and those who responded to his grievances (Dr. Bannister, Cortez Masto, McDaniel, Garcia, Buchanan, Palmer, Cox, Bellanger, Waters, Herrera, Reed, LeGrand,) are liable on the basis that they knew he was not getting adequate care but failed to intervene. (Doc. # 6 ¶¶ 133, 134, 148, 149, 155, 158.)

**A. Care at LCC-Poag and Dr. Scott**

Plaintiff was at LCC from July 18, 2011, until he was transferred to NNCC for further medical evaluation on September 29, 2011. Therefore, this claim focuses on the care he received from defendants Poag and Dr. Scott at LCC for a period of just less than two and a half months.

Plaintiff first complained of shoulder pain on July 24, 2011, which was followed by another kite on July 25, 2011. He was seen by Dr. Scott on July 27, 2011. Plaintiff claims that Dr. Scott told him that because he could take his shirt off, he was fine. (Doc. # 27-5 at 3 ¶ 12.) The progress notes for this appointment reflect that Dr. Scott noted decreased range of motion and slight swelling of the scapula. While Plaintiff claims Dr. Scott told him that his shoulder was fine, he Plaintiff does not dispute that he was prescribed ibuprofen and analgesic balm. Plaintiff sent a kite on August 9, 2011, stating that his shoulder was getting worse and asked for a second opinion. He sent another kite directed to Poag on August 13, 2011, again asking for a second opinion and asking for the results of the blood test relative to his testicular mass. Poag responded: "You'll see the doctor when the test results are back. I suggest you discuss treatment options for your shoulder with him." (Doc. # 27-16 at 29.)

His next kite was sent on August 21, 2011, asking to be seen and to have an x-ray. He was advised that he had been scheduled for a follow up appointment, and saw Dr. Scott a few days later, on August 25, 2011. At that point, Dr. Scott recommended that he be transferred to NNCC for further evaluation.

Plaintiff sent an emergency grievance on September 1, 2011. In that kite he said he went to sick call but was not examined for his injuries. He requested medication relative to his

1    heartburn and an infection, but did not mention medication for his shoulder.  He sent another kite

2    on September 11, and was seen on September 13, 2011. At that time, Dr. Scott noted that

3    Plaintiff would be transferred to NNCC "very soon" for evaluation. He was prescribed an

4    ibuprofen pack. On September 14, 2011, Plaintiff sent a grievance that, in essence, asked why he

5    had not yet been transferred. In the grievance, he alluded to the fact that at the September 13,

6    2011 appointment, Dr. Scott did not know Plaintiff had not yet been transferred, left the room,

7    and came back and gave Plaintiff assurances he would be transferred soon. In response to the

8    grievance, he was told that he would be transferred.

9         His next kite was dated September 27, 2011, and he was seen on September 28, 2011,

10   and transferred to NNCC a day later, on September 29, 2011.

11        The court cannot conclude on the basis of these facts that Dr. Scott or Nurse Poag were

12   deliberately indifferent to Plaintiff's serious medical needs. The records reflect that when

13   Plaintiff sent a kite, he was seen shortly thereafter. While he claims that Nurse Poag refused his

14   request for a second opinion, Dr. Scott continued to see him, and in fact referred him to NNCC

15   for further evaluation. At NNCC he was seen by Dr. Long, who recommended an MRI and

16   diagnosed him with a torn rotator cuff and winged scapula. While there was about a month-long

17   delay from the time Dr. Scott ordered Plaintiff's transfer on August 25, 2011, and the time

18   Plaintiff was transferred to NNCC on September 29, 2011, Plaintiff continued to be seen by

19   medical staff at LCC and was given ibuprofen. To the extent he is contending that the ibuprofen

20   was insufficient, that amounts to a difference of opinion in the course of action Dr. Scott chose to

21   adhere to in treating his shoulder injury. Plaintiff has not presented evidence that the decision to

22   give Plaintiff ibuprofen until he could be evaluated further at NNCC was medically unacceptable

23   under the circumstances or was chosen in conscious disregard of an excessive risk to Plaintiff's

24   health.

25        Therefore, the court recommends that Plaintiff's Motion for Summary Judgment against

26   defendants Dr. Long and Nurse Poag related to the care he received at LCC for his shoulder

27   injury be denied, and that Defendants' cross-motion be granted with respect to this claim.

28   ///

**B. Care at NNCC-Dr. Gedney, Dr. Johns, Nurse Peery**

With respect to Dr. Johns, Dr. Gedney and Nurse Peery—who were involved in providing care to Plaintiff at NNCC—the court concludes there is no evidence of deliberate indifference. Instead the medical records establish that Plaintiff received responsive and consistent care while he was at NNCC.

Plaintiff was transferred to NNCC on September 29, 2011.  His chart was reviewed the very next day and he was referred to a provider, and was seen initially regarding his shoulder on October 3, 2011, just a few days after his arrival. He was issued ibuprofen and was scheduled to see a doctor on October 19, 2011. He sent a kite on October 7, 2011, and was told to report to sick call, and he was seen there on October 12, 2011. He was given ibuprofen and was told to keep his appointment on October 19, 2011. His appointment was changed to October 27, 2011, and on that day he saw Dr. Johns. She ordered an x-ray and referred Plaintiff to Dr. Long. The x-ray results were normal.

Plaintiff saw Dr. Long shortly thereafter, on November 2, 2011, who suspected a torn rotator cuff and winging scapula. He recommended an MRI, Plaintiff was given ibuprofen for his pain. Dr. Long told him to discuss alternative pain medications with Dr. Gedney. He sent a kite on November 6, 2011, stating that he was in pain, and he saw Dr. Gedney on November 12, 2011. She referred him back to Dr. Long. He sent another grievance that he was in pain on November 17, 2011, and he was seen that same day and given pain medication. The request for the MRI was approved on November 22, 2011, and was performed December 6, 2011. It confirmed a torn rotator cuff and winged scapula.

Plaintiff went to sick call regarding his shoulder pain on December 28, 2011, and it was noted he was scheduled to see his provider a few days later. He saw Dr. Gedney on January 4, 2012. She went over the MRI results, advised him as to light range of motion exercises and ordered that he see Dr. Long again so Dr. Long could make a recommendation as to surgery and rehabilitation. He saw Dr. Long on January 12, 2012. Dr. Long confirmed the results of the MRI, but noted that Plaintiff was going to be released in two weeks, therefore he was not recommending surgery.

1   These facts establish that each time Plaintiff sent a kite or grievance while he was at

2   NNCC, he received responsive care. He was promptly referred to a specialist, given pain

3   medication, and an MRI was performed. Once the results of the MRI were received, Dr. Gedney

4   referred Plaintiff back to Dr. Long for a recommendation regarding surgery. He declined to

5   recommend it at that point because Plaintiff would be released from prison on parole in two

6   weeks. The court finds no evidence of deliberate indifference with respect to Dr. Gedney,

7   Dr. Johns or Nurse Peery insofar as Plaintiff's shoulder is concerned. Therefore, Plaintiff's

8   Motion for Summary Judgment should be denied as to this Eighth Amendment deliberate

9   indifference claims against them, while Defendants' cross-motion should be granted.

10   **C. Supervisory Defendants**

11   In light of the court's findings that there was no underlying constitutional violation,

12   Plaintiff's claim against the supervisory defendants also fails with respect to the supervisory

13   defendants and they should be granted summary judgment as well.

14   **b. Heartburn**

15   Plaintiff's Motion for Summary Judgment makes no mention of his heartburn issue, save

16   for one brief statement that he suffered from gastrointestinal issues as a result of medications he

17   was being given. (Doc. # 27 at  30:21.) His affidavit likewise contains a fleeting reference to

18   heartburn, but only to state that it was a "nagging pain" while the pain in his shoulder was

19   extreme. (Doc. # 27-5 ¶ 16.) Therefore, the court will focus only on the argument presented in

20   Defendants' Cross-Motion for Summary Judgment relative to this issue.

21   In his Amended Complaint, Plaintiff alleges that he continually saw doctors for his

22   heartburn, but Drs. Johns, Scott and Gedney failed to find out the root cause of his problem, or

23   listen when he told them he was recently prescribed a proton pump inhibitor for GERD and

24   without it he would vomit during the night. As a result he had difficulty sleeping. (Doc. # 6 at 38

25   ¶ 151.) He asserts that Dr. Johns, Dr. Scott, and Dr. Gedney  merely gave him antacid tablets,

26   and failed to investigate his medical history. (*Id*. at 39 ¶ 152.) He also states that Dr. Scott,

27   Dr. Johns, Dr. Gedney, Poag, Peery and Dr. Bannister were unconcerned about Plaintiff's pain.

28   (*Id*. ¶ 153.)

1    Defendants contend that each time Plaintiff sent a kite regarding his heartburn, he was

2    answered and told to report to sick call or a medical appointment was scheduled. (Docs. # 29/30

3    at 19.) When it became clear antacids were not working, he was prescribed a new medication.

4    (*Id.*) His kites did not include a request for a proton pump inhibitor. (*Id.*) They maintain that

5    simply because Plaintiff did not agree with the course of treatment does not mean there was

6    deliberate indifference. (*Id.*) Plaintiff's response to Defendants' Cross-Motion for Summary

7    Judgment does not address his heartburn claim. Instead, he merely states generally that he has

8    provided sufficient evidence of deliberate indifference. (Doc. # 37 at 12.)

9    When Plaintiff arrived back into the custody of NDOC on June 8, 2011, the only notation

10   relative to any gastrointestinal issue was that Plaintiff had been taking an H2 blocker for GERD,

11   along with Metamucil. (Doc. # 31-1 at 3, 5.) There was no reference to a proton pump inhibitor.

12   When he transferred to LCC on July 18, 2011, no medical problems were noted. (Doc. # 27-17 at

13   13; Doc. # 27-20 at 3.) On August 25, 2011, Plaintiff was prescribed Zantac and Tums.

14   (Doc. # 27-17 at 18; Doc. # 31-4 at 5.)

15   He sent a grievance on August 26, 2011, that stated he was still vomiting while he was

16   sleeping, and he requested the proton pump inhibitor he had been prescribed before his return to

17   NDOC. (Doc. # 27-19 at 57-58.) He said that Dr. Scott told him it had been too long since he had

18   been prescribed the proton inhibitor to give it to him. (*Id.*) In response, he was told that Dr. Scott

19   had prescribed him Zantac and Tums, and to request an appointment or come to sick call if his

20   symptoms worsened. (Doc. # 27-19 at 12.)

21   He sent a grievance on September 1, 2011, stating that he was supposed to have received

22   Prilosec for his heartburn, but was advised they forgot to order his medications. (Doc. # 27-19 at

23   31-34.) He sent another grievance around September 26, 2011, where he stated he had not been

24   given treatment for his heartburn. (Doc. # 27-19 at 10.) He was seen on September 27, 2011, but

25   there is no reference to any complaint regarding heartburn. (Doc. # 27-17 at 24.) He was

26   transferred to NNCC on September 29, 2011. (Doc. # 30-1 at 2; Doc. # 27-17 at 12.)

27   On October 2, 2011, he sent a kite asking for more heartburn medication and was

28   instructed to report to sick call. (Doc. # 27-16 at 20.) He was seen on October 3, 2011, but there

- 43 -

1   is no reference to a complaint about heartburn. (Doc. # 27-17 at 23.) Plaintiff was seen at sick

2   call on October 19, 2011, but there was no notation regarding his heartburn. (Doc. # 27-17 at 23.)

3          Plaintiff saw Dr. Johns on October 27, 2011, with a complaint related to his GERD. (Doc.

4   # 27-17 at 22.) She prescribed him Zantac and Maalox. (Doc. # 27-17 at 16; Doc. # 31-4 at 3;

5   Doc. # 27-17 at 55.)

6          Plaintiff saw Dr. Gedney on November 12, 2011, but there is no notation that he

7   complained of heartburn at that time. (Doc. # 27-17 at 21.) He was seen related to his heartburn

8   on November 17, 2011, and was given Tums. (Doc. # 27-17 at 20.)

9          Plaintiff was seen at sick call on December 28, 2011 related to his heartburn. (Doc. # 27-

10  17 at 20.) It was noted that he was scheduled to see a provider on January 4, 2012 regarding his

11  gastrointestinal problems. (*Id.*) Plaintiff saw Dr. Gedney on January 4, 2012. (Doc. # 27-17 at

12  19.) She discussed his gastrointestinal problems with him, and changed his medication from

13  Zantac to Prilosec, and renewed the prescription for Tums. (*Id.*; Doc. # 27-17 at 15-16, 19, 51.)

14         On January 17, 2012, Plaintiff came in for a "mandown" regarding a Tums refill but

15  exited before he could be evaluated. (Doc. # 27-17 at 19.)

16         The court finds no evidence of deliberate indifference related to Plaintiff's treatment for

17  his gastrointestinal issues. Plaintiff's requests for medication and to be seen were promptly met

18  with prescriptions, sick call visits or visits with physicians. When it was determined one

19  medication was not working, he was prescribed another. While he contends that his requests for

20  a proton pump inhibitor were ignored, there is no evidence that he ever made such a request to

21  his providers. The only reference is to the device is in one informal level grievance. Even taking

22  Plaintiff's allegation as true—that Dr. Scott told him the prescription was too remote—Plaintiff

23  has presented a difference of opinion with respect to the course of treatment chosen by his

24  providers. His response to Defendants' motion does not mention this claim, let alone provide

25  evidence that this course of treatment was taken in conscious disregard of an excessive risk to his

26  health. Because the court cannot find a basis for liability for those directly involved in his care,

27  the supervisory defendants named with respect to this claim are also absolved of liability.

28         Therefore, the court recommends that Defendants' motion for summary judgment be

1    granted as to this claim.

2                   **c. General Claim of Inadequacy of Medical Department at NDOC**

3            With respect to Plaintiff's claim in Count IX that the entire system at NDOC is

4    inadequate, Defendants argue that Plaintiff received adequate healthcare; therefore, this claim

5    fails. (*Id*.)

6            Count IX alleges generally that NDOC lacks basic elements of an adequate prison health

7    care system, including adequate, accurate up-to-date medical record keeping; ready access to

8    medical care; reasonably speedy referrals and access to other physicians in the prison; and an

9    adequate system for responding to emergencies. (Doc. # 6 at 42 ¶ 160.) Plaintiff has presented no

10   evidence to support his claim that NDOC lacks accurate and up-to-date medical record keeping

11   or an adequate system for responding to emergencies. Therefore, his motion for summary

12   judgment should be denied in this regard, while Defendants' should be granted. With respect to

13   his claim that NDOC lacks ready access to care with speedy referrals, these allegations are

14   duplicative of his claims that he did not receive responsive care for his complaints of shoulder

15   pain, and will be analyzed in that context in connection with the counts above. He has provided

16   no evidence to support his allegation that this was the case in a general sense.

17           He also alleges that internal audits uncovered that medical staff were not working their

18   entire shifts, (*id*. ¶ 161), yet he provides no evidence that this was the case with respect to the

19   medical staff who treated him at LCC or NNCC. Irrespective of the deficiencies reported in the

20   audit, there is no evidence of deliberate indifference to *Plaintiff's* medical needs; therefore, the

21   audit report is irrelevant. Accordingly, his motion should be denied in this respect, while

22   Defendants' motion should be granted.

23   **D. Retaliation**

24           Within his classification/due process argument, Plaintiff also asserts that he was retaliated

25   against when he was threatened with being placed in the "hole" or administrative segregation if

26   he continued to ask for medical assistance. (Doc. # 27 at 18:8-10.) He similarly states in his

27   declaration that when he repeatedly filed requests for medical attention and presented to sick

28

1   call, defendant Poag threatened him with the "hole" if he kept it up. (Doc. # 27-5 ¶ 16.)[11] He

2   appears to contend that this was to discourage him from filing further kites or grievances seeking

3   medical treatment. (*Id.* at 18:13-16, 20-21.) He concedes he did continue to file kites and

4   grievances, but asserts that the proper inquiry is not whether his First Amendment activity was in

5   fact chilled, but rather, whether the conduct would chill or silence a person of ordinary firmness

6   from filing such requests in the future. (*Id.* at 18-19.)

7         Defendants argue that while Plaintiff presents this argument in his motion, he did not

8   plead a First Amendment retaliation claim in his Amended Complaint. (Docs. # 29/30 at 23.)

9         Plaintiff's response is that he was pro se when he filed the Complaint and Amended

10   Complaint, and the allegations should be construed liberally, and besides that, Defendants did

11   not file a motion to dismiss challenging the sufficiency of the pleadings. (Doc. # 37 at 8-9.) As

12   such, he contends they are foreclosed from challenging the sufficiency of the Amended

13   Complaint. (*Id.* at 9.)

14         The only reference to such a claim in the Amended Complaint is a single sentence in the

15   recitation of facts, where Plaintiff states that he presented to sick call on October 24, 2011, and

16   Poag threatened that he would send Plaintiff to the hole if he continued to ask for medicine.

17   (Doc. # 6 at 23 ¶ 72.) As Defendants point out, when Plaintiff asserts specific constitutional

18   violations, there is no mention of a retaliation claim. Moreover, Plaintiff did not even plead the

19   elements of a retaliation claim that would have put Defendants on notice that he was asserting

20   such a claim, regardless of whether he labeled it as such. He did not allege that adverse action

21   was taken against him because he was filing grievances, or that this chilled the exercise of his

22   First Amendment rights. *See Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005) (citation

23   omitted). Therefore, the court finds Plaintiff's Amended Complaint does not assert a retaliation

24   claim. Plaintiff cannot amend his pleading implicitly by including a retaliation argument in his

25   dispositive motion. If he sought to include this claim, he should have filed a motion for leave to

26   amend prior to the deadline for amendments in the scheduling order. He did not; therefore, the

27

28         [11] He references Exhibit 18, page 164, which is Doc. # 27-19 at 13; however, this document does not state anything about being threatened with the "hole" or administrative segregation.

court need not address his argument.

## IV. RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that the District Judge enter an order **DENYING** Plaintiff's Motion for Summary Judgment (Doc. # 27) and **GRANTING** Defendants' Cross-Motion for Summary Judgment (Doc. # 30).

The parties should be aware of the following:

1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C), specific written objections to this Report and Recommendation within fourteen days of receipt. These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the district judge.

2. That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of judgment by the district court.

DATED: February 17, 2015

WILLIAM G. COBB
UNITED STATES MAGISTRATE JUDGE